I'm very pleased that we have with us on our panel this morning, Judge Farman of the United States District Court in the District of Delaware. First case this morning is number 06-1634, Claussen Immuno Therapies against Biogen. Mr. Cito. Thank you. Good morning. As the court well knows, we're here on a number of issues in this case. I think 271E1 and section 101 issues are some of the first two that I want to talk about. The reasoning of the district court, as we presented in our briefs, is that if at any point during the life of a drug, there's any potential reporting requirement, then any patents that relate to that drug cannot be infringed. We think that's a very over broad reading of 271E1 safe harbor exception. We believe the court, as argued to the court as presented below, anything dealing with safety falls under the safe harbor provisions, and that's not what 271E1 was written for. 271E1 pertains to pre-approval process for drugs, not post-approval. These are vaccines which were approved a dozen or more years prior to patents being issued and were approved prior to the case, and have not gone back through for another IMBA or AMBA, or any sort of approval process. And so 271E1, we just don't think applies. On the second level, if it did apply to the activities in the case here, these are clearly research tool patents. They're not a patent on a compound that's used, or an investigation for efficacy of a compound, or how a compound can be combined into a new drug. But you can't really put this into the standard definition of research tools. I think you quoted it, that the National Science Foundation has adopted. Yes, I think you can. Where is it? It fits under methods, I believe that's in the national standard. The fact that something is a way of doing something, we haven't reached the substance of how that should be treated. Doesn't automatically turn everything into a research tool, does it? Yes, I agree with that, I think there's some, there's an unsettled issues in the laws to what it is. Are you pressing that issue, or should we go on to some of the others? We're not pressing that issue, I think that's a secondary issue, which it falls under the research tool. But the primary issue is that 271 is just not applicable to this case, because we're not talking about the development of a new drug. We're not talking about activities solely for generating information to report it to the FDA. So I think we're just outside the scope of 271. But 271E1 isn't limited to the development of a new drug. It doesn't specify anything about a new drug. It doesn't even specify the FDA in there, right? That's correct. So why should we read these limitations into an otherwise clear statute? Because otherwise the statute applies to all drugs and all patents on all drugs. Which vitiates an entire area of drug. I'm having trouble understanding that argument. How is it that this statute applies to all drugs? If I interpret it the way that- The court- I would suggest it should be. Okay, the court in their decision on page six, paper number 76 in the court, states specifically the Food and Drug Administration collects vaccine data from vaccine manufacturers after the vaccines have been approved. Well, that's true for all drugs. The FDA collects data on all drugs. The obligation is to report an adverse impact, isn't it? Not to report everything that happens. Correct. It's to report adverse impacts, which all drugs are subject to that. But why shouldn't, as a matter of statutory interpretation, although I think legislative history doesn't really deal with post-registration submissions to the FDA. Because ordinarily those submissions, as I understand what we call the enactment of that statute, there could be many years of pre-registration effort that otherwise was being foreclosed because of the prior statutory interpretations. But if, in fact, an adverse effect on safety or efficacy or whatever, turns out that's required to the FDA, why shouldn't that be included? Because it doesn't serve the statutory purpose. The statutory purpose was to allow the investigation for generic drugs. So the generic drugs would come on the market once the patents had expired on the brand name drugs. That's the reason for 271E1 and 271E2, which gives the manufacturer the right to file suit to determine whether that drug would be approved. So would you not agree that the clear language of 271E1 does not limit it to pre-FDA approval activity, but rather the purpose, which we can glean very clearly from the legislative history, suggests that that's what it's supposed to mean? Would that be an accurate statement of your argument? If you ignore solely for useless reason you're related. Okay, because this is a commercial drug that is being sold for commercial purposes. It's being used to treat, it's a vaccine, to vaccinate. So the purpose of the drug, the statute says solely for useless reason related to the development of. That's clinical studies, pre-approval clinical studies. But where does it say that though? It says for submission of information under a federal law. So where do you get the sense that this statute, the clear language of this statute in some way mandates it is limited to pre-approval? Because if you're marketing the drug, the drug is not being used solely for a use, reasonably related to the development and submission of information. It's being used to treat, to vaccinate people. It's being commercially sold to make money. It's not, this activity isn't just to collect data. That's what a pre-approval study is. It's for the purpose of collecting data, not for the purpose of treating. But the scope of the patent, we haven't gotten to that, and I hope it will take some time to discuss it. Does it extend all uses of these products, isn't that right? But only to, on your theory of infringement, to the use which involves the implementation of the studies of optimum application in the vaccine. It's also, it's the subsequent immunization based upon the optimization of vaccine schedules. It's not simply the development of or the recognition of an optimum schedule. It's the immunization according to that schedule for the additional treatment of reducing the incidence of immediate, immediate- No, that's, that talks about that. That's, so, because one of the points that your opponents have made is that they, if in fact they have been applying the vaccine on a schedule that experience shows is optimum or close to it. It couldn't be covered by a patent, could it? Yes, it could. That's the argument that they were already using the same schedule. Yes, it can, because the patent doesn't require that you change the schedule. The patent only requires that you recognize which schedule is correct. And the allegation that you haven't changed the schedule is inaccurate. Schedules have changed and have been modified since studies were done from four-dose schedules to three-dose schedules, from early schedules to later schedules. There have been some changes. But the patent doesn't require that you change the schedule. Simply that you recognize and that you make the decision subsequent to the recognition to use the schedule that is most optimal, either for that patient or for that class of patients or that class of recipients. But if in fact that schedule has already been used, either it would invalidate the patent on the ground of anticipation, or it would be outside the scope of properly construed claims, wouldn't it? If the schedule existed beforehand and was continued to be implemented without reference to the study, without consideration of its benefits in treating immune-mediated disorders, then that could be true, that that particular use by that particular individual may fall outside the scope. Because I understand Dr. Classen's contribution was to study the data which have been gathered based on various methods and timing and so on of immunization. To decide which one is optimal. So it would have had to have already been out there in order to be included in the study, wouldn't it? The schedule had already been out there. Yes. Correct, but not the comparison amongst schedules, but the recognition of the effect. Let me ask you, if you don't mind me moving you a little bit, if you're talking about the comparison and recognition, these to me seem to be mental steps, and you acknowledge as much in your brief. This is not something that has to be done on the paper. It doesn't necessarily require clinical trials. So are mental process patent claims, statutory subject matter, your one on one? Yes. There is more than mental process to these claims. Okay, that's a fair point. So there's definitely, because you're immunized, and that's not something you're doing in your head. Clearly, you're injecting someone with something, or usually, I guess, one of them you can now take orally. But anyway, yes, so clearly, you're absolutely right. These are not exclusively mental process claims. But would you agree that, apart from the immunizing step, that the rest of your patent steps are something that can be done in your head? If we include the immunizing step as the implementation? I'm saying apart from that. Apart from the immunizing step. Say that step wasn't there in the claim. So the rest of that, the steps in your patent claims are things that are not exclusively in your head. You're comparing, you're recognizing, you're thinking about, you're choosing, based on your thoughts about which one is better, based on your reading materials or your schedules. All of those steps of the process are performed in your head. That's correct. And I'm including the implementation of a preferred schedule as part of the immunization. That's a physical thing. You implement a schedule and you're immunized. Yes, that's right. You immunize. That is the implementation of the schedule. It's the immunization according to a schedule. Yeah, the rest of it does not require that the actual infringer do the actual clinical study, but only that you read it and think about it. But at some point, someone has to have done the clinical study to get the results. Right, but that's not what's covered by your claims. It's just the reading about them, the thinking about them, and choosing one. Right. It can't be covered by the claim if you happen to be the person that did the clinical studies also. Okay. So if suppose that were all the quotes to your claim, and I recognize it's not, would that in and of itself be patentable if the entire, every step of your claim was performed exclusively in someone's head? I mean, how are you going to police ideas in people's heads? How are you going to enforce patents like that? Do you think that Congress meant for those sorts of patents that sort of idea to be patentable? The mental steps. And I recognize that's not your patent. So I'm not binding you. What you say with regard to this answer doesn't necessarily bind you, in my mind, to whether or not it's patent level 101. I'm just asking you to think about that idea for me. Yes, I think it's clearly patentable subject matter because I don't think a patent statute requires that you are able to enforce your patent in order to have a valid patent. No, but what about Gottschalk v. Benson where the Supreme Court used the words mental processes are not patentable subject matter? They're one of the exceptions, like abstract idea, natural phenomena, laws of nature. When the Supreme Court said that, we don't get to disregard that, right? That's correct. So would your understanding then be, if we're bound by that Supreme Court precedent that says mental processes are not patentable, and if your patent had only been to the first steps, that that would then not be patentable? It didn't include the immunization step. If you have to characterize it as only a mental process, then yes, but I don't think it's just a mental process. Simply because you think about something doesn't make it only a mental process. If you take it into consideration and there's a recognition of certain relationships that were realized by Dr. Gossett in his work, he's taken that mental process, if you will, and put it into a therapeutic method of treatment. And so if the mental process, the result of that, we take off the immunizing step, but as a result of the mental process activity, that physician then goes and immunizes somebody according to a particular schedule, even though that immunization step isn't in there. That mental process has resulted in physical action. But really, the judge touched on a subject matter according to the claim scope. So if your claim scope didn't include the immunization step, it would be, by your own, I think, admission, nothing more than a mental process, right? But it's not your claim. I recognize that. At some point, there are parts that are only a mental process. And so the part that's not the mental process is the step of immunizing. That's the part that's not. It's the step of implementing a particular schedule through an immunization routine. It's not the simple act of immunization, which the court below recognized was unobvious and not in the court's decision below. But they still held it not attached to a subject matter. I'm trying to come to understand their decision. But that was not a mental process. It was natural consequence. Well, they used the word mental process in the opinion. They did, but they came to the conclusion that it was slightly more than a description of the natural process, the correlation between vaccination and immunity. I think they used all of the exceptions interchangeably, perhaps. But nonetheless, regardless of which exception they sort of characterized it as, they clearly did discuss it at one point as a possible mental process. Right, but then the problem with that decision comes in in that last step, which is immunization, because if you take that step out and ignore it, most all methods of treatment become nothing more than a fiddly-veiled mental process or natural phenomenon. If you know that scolaxin is a good muscle relaxant, that's a natural phenomenon. It has a natural reaction to the body. But you have a patented method of treatment using scolaxin, so that you can do it better or worse. So I think the court is wrong in that, in ignoring that this is a method of therapeutic treatment using a phenomenon. But Mr. Clawson didn't invent, at least as I understand his claims, a basis for distinguishing the use, for which one is best. He says, okay, look at other people's studies, and if they've concluded one has lower risk with regard to certain side effects, whether it's diabetes or other things, then another, choose that one. That's his contribution. His contribution isn't telling you which one is better. His contribution is, when someone else has shown, through various studies, which one is better, that's the one you should choose. Isn't that right? No, that's not exactly accurate, because the other studies don't necessarily say one is better or the other. So the studies prior to Dr. Clawson, you can't look at studies that occur after Dr. Clawson's contribution and say, oh, that's prior art. Dr. Clawson's contribution was the recognition of the relationship. The studies that were conducted by the defendants afterwards were based upon that recognition. But he doesn't go so far as to say, I have determined, I have recognized, and I think this is why the district court focused on the natural phenomenon. He doesn't say, I have recognized that this is what you should do, and then identify a specific mode of application. He says, you should do this. Actually, it does. That was another problem with the district court, is they looked at one claim from each patent and made a broad-sleeving decision on the entire patent. There are claims that I can hold up. You didn't agree that that claim was representative? No. There was no oral arguments in the court below. There was no hearings. It was just on the papers. We argued several times. You can't judge a patent on one claim. There are 170 or 180 claims between the three patents. For example, just opening up, claim two of the 139 patent says, extreme schedule starting at less than 42 days after birth. There are specific schedules in here. Eight has a method of treatment and goes through a list of different diseases to look for. But those schedules are in the prior act. I realize that we're exhausting your time, and you've asked to save some rebuttal time. Let's hear from the other side. Good morning. Mary Graham on behalf of Merck. I was taking my time with Mr. Pappas. The court is focused right in on the Section 101 issues. Absolutely, Mr. Klassen claims to have invented a mental process that's clear in everything he says. He says you infringe if you read things. Whenever an invention involves thinking and mental processes, help us understand where to draw the line. If somebody, let's say that there's a generic class of compounds that are shown to have a particular property, and someone identifies which one is the best, that's accepted not to be a mental process because you do physical manipulations. Suppose, however, someone can figure out which of the class of compounds is the most effective just by looking at it and saying, aha, this has this constituent and this shape, and therefore it's the best. Where would you draw the line in mental process broadly? Well, Mr. Klassen doesn't claim to have invented a new schedule, first of all. His only claim to anything new is in the head of a doctor who does exactly what they did before. Well, I was focusing on the first thing that you chose to tell us, which is that this is a mental process, therefore schools help. Well, no, then the question becomes, so that's what his invention is, as he says it, but then the question is, as the court was focusing on, what happens by appending a physical step of immunizing? And under the Supreme Court precedent of fluke, you have to ask yourself, is that a fig leaf? And I would submit that it is. And you are focusing on the question I was trying to ask, maybe I wasn't clear. I'm sorry. Every invention involves thinking. Somewhere it's along the way. Where do you draw the line between that which one thinks and that which one does physically? Well, every invention involves thinking to come up with it, but one doesn't claim the thought process of someone else in coming up with something, and that's the difference with his claims. He claims what someone else thinks is his invention. He is not claiming a new schedule, a new vaccine, a new mode of delivery, for example. So that distinguishes his invention. As a matter of distinction, yes, I agree that that distinguishes it, but it distinguishes it if I'm not sure. And if you're still talking about statutory subject matter, does it matter who does the thinking? Absolutely, because the claim to a mental process is not patentable subject matter under the Supreme Court precedent, and that's what his claims are, too, because the immunizing step, the only physical step in the claim, is conventional, obvious. It's the only logical thing to do that one would do after having this thought process. And, in fact, that's what one was planning to do in the first place. Any doctor who's going to immunize a baby then thinks about the class and the work and says, oh, yes, I'll proceed to immunize according to the exact same schedule I've always been using. I'm sorry, you mentioned obviousness. Obviousness is a thought process. That would have been obvious. It would have been? It would not have been obvious. That's a mental evaluation, is it not? I'm not talking about the overall obviousness of the claim when I'm talking about the step. It's the logical follow-up. It's the act-accordingly step, to use Justice Breyer's words, after you have looked at this data, because you're comparing two schedules for the purpose of determining whether one is safer than the other, whether the one you've long been using is safer, for example. But essentially it says the invention as a whole, not an individual stepper. Absolutely. But the invention as a whole, as he admits, is to thinking that logical step at the end of immunizing or at the beginning is simply a fig leaf. And the Supreme Court was clear in Fluke that you have to analyze it. And just in there, in terms of adjusting the alarm limits, the court held that that final step, after calculating the new alarm limit, the fact of physically going to adjust it did not save the claim because of the exalt form over substance. And so the court held that that was not that. Let me ask you this question. Let's say in reviewing all of the data, as Dr. Classen did, he perceives something known as limits. He says after two inoculations, 37 minutes apart on the seventh day are so effective that you don't have to have a third. And the third inoculation, maybe sometimes there are first reactions. Nobody's noticed that before. What happens to that insight? What happens to that contribution? But what he didn't do is claim that particular schedule. And only the independent claims are an issue which I can address with the court. He never argued to Judge Quarles, for example, to claim two. In your theory, would there be any way of claiming such an observation? You absolutely might be able to claim a new schedule, for example. If somebody hadn't done it before, you thought of it, and you say, oh, I'm going to claim this schedule with this particular vaccine at three months, four months, and ten months. Perhaps you might well be able to claim that, but that's not what these claims are about. Counsel, you suggested that mental processes are not patented under the Supreme Court precedent. I mentioned Gottschalk v. Benson. Is there anything else that you think lends credibility to that notion? Because arguably, the statement Gottschalk v. Benson was dicta, right? I mean, it wasn't a mental process in that case. Well, it's true in terms of a case where a claim was, for example, only to a mental process, other than perhaps the LabCorp case. I'm not sure, but certainly those claims, Benson, Fluke, they covered, I would submit, a mental process. If you could carry out those mathematical calculations in your head, that would be an aspect of the claim. That's here. So as he admits, you might conduct a physical study, but you also would be thinking in your head about somebody else's study. So you're saying you believe Fluke was a mental process claim? Well, the only physical step in it was to adjust the alarm limits at the end, and what was involved up to that point was calculating. I don't rely on Fluke or Deer. Though that precedent dramatically diminished the impact of Benson, did it not mean that the software industry was based on that evolution? That's a very difficult comparison. It's true, Benson by itself makes some strong statements at the time that it was decided. Nobody knew what the digital name was. I would submit that no precedent has cut back on the very old idea and basic idea that a mental process is not patentable. In the Dyer and Fluke cases, it's true that the court was addressing computer algorithms, as well as this court has subsequently addressed in a variety of cases. But that's not what this case is.  And if I respond to the court, I'd like to turn to the inherent anticipation point, because if you don't mind, before you go there, so would you suggest that a mental process claim, if the claim was written to a machine performing a process, which it just so happened that process could also be performed in your head, that the claim was in fact a machine claim, you wouldn't suggest that's unpatentable under the mental process exception, would you? Well, again, as in Fluke, you've got to look at what was invented. And it's true that in some instance you might attach a machine to it, and then we get back into all the line of cases that ask what you got when you got there. But you have to ask what the inventor has invented. Look, I don't know if you're thinking the same way I am, but your statement can suggest to me that all software is now unpatentable, if we rule that in this case a mental process is unpatentable. Because my concern is I'm not going to go too far. And I'm worried about creating a slippery slope here. If I say mental processes are unpatentable, is the result of that, that if you put a mental process on a machine, i.e. software and allopatent means post-function type claims, or state-driven means post-function type claims, have I just rendered unpatentable all those things? Because I can't do that. No, I'm not submitting that algorithms are unpatentable subject matter at all. We don't even have to address that because he has no algorithm. He has a straight-up read somebody's paper, reach a mental conclusion through no process that he tells you how to derive. In fact, you can reach that even if you read papers that reach the contrary conclusion. And he doesn't tell you why he would dismiss all of the studies of the FDA, DiStefano, Asherio, all the people who say that his conclusions are unfounded. So it's not an algorithm. And I apologize if I've confused the court in making a suggestion that any of the cases in discussing an algorithm are necessarily a mental process case. That is not my position. So now you're saying Fluke is not a mental process the way this case is a mental process. Fluke is a mechanical algorithm. Well, I don't have all the facts of the Fluke claim in mind. It was a calculation for adjusting an alarm limit. My recollection was that it was a fairly simple calculation. And I don't think that the claim was tied to something physical other than adjusting the alarm limit at the end. But clearly, the reason that you don't run into mental process claims so often, I would submit, is because they're so clearly unpatentable, that in general, they're not getting through the process. So in the case, why didn't the PTO reject this one? Well, we would submit it should have. How does the idea of clinical discretion of the physician assist you in your argument about the mental processes of this claim? Well, he doesn't give any means for solving the dilemma, for example, if you're faced with conflicting data. And he says at 827 in a declaration of his that there's data that you can immunize early or you can immunize later. In one case, you're lowering the risk of diabetes. In the other case, you're lowering the risk of asthma. And he doesn't tell you how to resolve that. So that's an aspect. That's part of the art of medicine as opposed to the science of medicine. And isn't that why it's the exercise of a mental process that he's trying to cover? Right. It's the exercise of a mental process in which he gives no guidelines for how one should carry that out. So if I might, because I'm running into my co-counsel's time, so I'd just like to emphasize that alternatively, if one focuses on the physical step now, the immunizing step, there is no question that that is old. He admits it. You can immunize with the same old ACIP schedule from the late 1980s. So then all you're left with in his claims is the recognition of what is an inherent property. And it's well established under the Bristol-Myers case, under the Ingram-Stiffers-Sprouts case, which cites the Ingram-May case. All of those cases, his claims are inherently anticipated. Finally, I would just like to make clear, with respect to the dependent claims, he never argued to the court below that the court should look at limitations of the dependent claims. He took his broad construction for purposes of infringement. We then used that both to get summary judgment on non-infringement. We took his claim construction. We then took his claim construction on invalidity. It was live by the sword, die by the sword. If he was going to raise limitations as being relevant, for example, as he did today under Conoco, he had to have raised them below the document waiver of a Stockholm appeal. He can't raise them now. Finally, with respect to non-infringement, so that the record is clear, I would just like to point out that there were only four documents before the district court that were considered on the motion for summary judgment and that should be considered on the motion for summary judgment. Those were the DiStefano study, Plassen's letter, and the DiStefano response, Newark's package insert, and the FDA response. All of the other material that he cites, the Asherio study, any other studies, all came in at the earliest on the motion for reconsideration, and the judge properly held that he had given no reason not to have cited those earlier. Thank you. Thank you, Ms. Brennan. Mr. Douglas, you have reduced time. I understand that, Your Honor. Good morning. With that in mind, I'll turn to the 271E issue. Let me say at the outset that we recognize that the precise question that we pose to Judge Quarles in which he ruled in our favor has not been considered by this court or by the Supreme Court. That is to say whether or not the 271E1 exemption can apply to post-approval activities. We submit, however, that under the Supreme Court's decision in Merck v. Integrity and the plain language of the statute, that that is the conclusion. But it wasn't an issue in Merck. It's not really quite appropriate in the Supreme Court, is it, to read a decision on quite unrelated facts that the court had no idea they might be affecting? You mean the district court, Your Honor? No, the Supreme Court. You're saying that when you read the broad language in the Integrity case, it did indeed, in effect, reach some of the facts that were presented in that case. Yes. But this post-registration set of submissions to the FDA for whatever reason certainly do not contain registration. Is it close to that situation, is it? No, it's not the precise situation that was before the court. But as I think I'm obligated to do as any advocate before this court, is that when you're confronted with a case of first impression, a question that's never been plotted before, I think it's appropriate to look at least to what has been said by prior courts for guidance. But let's focus, if I could, Your Honor, on the statute, which I think gives us the answer. 270E1, by its express terms, is not limited to pre-approval versus post-approval activities. And the exemption says, don't look to time, I may take. There's nothing in the statute that says, look at the time. What the statute says is look at the activities that is engaged in by the defendant to the extent he's alleged to have used an infringing product or an infringing process. But the question was to go back in time, not to go forward in time. There was a substantial debate in terms of going back in time, in that case, to Udenua Basic, if I can use that term, research. But in terms of going forward in time after a product was financial, it just wasn't important. I understand that, Your Honor. So we have to decide then how we reach or how we should reason to answer the question, if possible. And we conclude that since the statute, taking the statutory language at its face, it provides an exemption for use of patented inventions or processes, reasonably related to information and data that one must submit to Udenua. Hold on, though. You just read out the word solely. I mean, counsel, before you pointed out that the patent exempts acts solely for uses reasonably related to the development and submission of information under federal law. When you're using a particular method in a commercial process or using it commercially, is that solely for uses for submitting to the FDA? Judge Moore, first of all, in my response to the question of how to use the word solely, I will adopt what the Supreme Court has said, and that is that they do not, as I read Justice Scalia's decision and other cases that have decided this, they don't read solely to mean that the only purpose for which the work is done is to gain FDA approval. It's clear from Merck, as well as cases in this court, that there can be many other purposes or reasons that flow from this study. The focal point should be at the time we practiced it at all, and we don't say that we did it, but on 12b-6, I have to assume the truth of the allegations is pleaded. At the time the class and method was practiced, which is to compare immunization schedules and decide whether or not one is more risky, ergo adverse. Do we have an obligation to report that to the FDA? And the answer, under the regulations and the statute, is clear. We must. And what we're arguing to this court is an artificial barrier of pre-approval, post-approval, should not make a difference. Let me give you a concrete example. Let us assume as we were petitioning the FDA for approval of a vaccine that we found that if you gave the vaccine at two months instead of four months, at two months, 50% of the children in the United States got diabetes. If we gave it at four months, 2%. The FDA unquestionably would want to know that data, and Claston even admits that if we gave that data of adverse events based on a study and a comparison pre-approval, 271 exempts are activities. Now let's assume in my example that nine days after approval, a new study comes out which reports for the first time that if you also give the vaccine at six months, 100% of the children of America will contract diabetes. Under the Claston theory, even though we are required by federal regulation to report those adverse events, to do so would subject us to compensatory and potentially triple damages for patent infringement. No, not to report them subjects you to the, to perform the patent, the method subjects you to damages for infringement, not to do the reporting. Reporting is required to do by law, but having done the comparison is what subjects you to damages. Right, but what I'm saying is 270, you're right, but how do we get the data? And what I'm saying is 271E1 gives, we believe, a safe harbor to activities that are performed whenever they're performed, as long as they're reasonably related to submission of data that is required by the FDA. And while I agree with Judge Newman that the Supreme Court has some very broad language in Merck versus Integra, and all they were looking at was whether or not pre-clinical data is subject to the exemption, not just clinical data. I do have to rely, and I think Justice Scalia was attempting to give us some guidance, as the court was on 271E1, when they said that the exemption extends to all uses of patented inventions that are reasonably related to the development and submission of any information under the FDA. Now, the court could have qualified the language. The court goes on to say there's simply no room in the statute for excluding certain information from the exemption on the basis of the phase of the research in which it was developed or the particular submission in which it could be included. Yes, but you know very well which phase of research that was directed to. I understand, but let me... And also, in terms of your argument, that even giving that class's patents, their broadest interpretation, he isn't saying that obtaining the data of measuring the effect of timing on the infant or whatever, he is not really sure how to interpret the patent. But I think that even in the broadest interpretation, giving it its full value, he's not saying that there's an infringement in obtaining that data, whereas in the Merck Integrate case, it was the obtaining, doing the research that was at issue. I understand, Your Honor, but in this case, the only reason we... If we practice the claimed method of classing, which is to compare vaccination schedules and determine which one is more or less risky, in other words, to look for either adverse events or to find that there are no adverse events, that we maintain that process that is reasonably related to what we have to submit to the FDA. And let me just add, Your Honor... 271A1 would relate and, let's say, immunize him easily because it's not what he says infringes his patent, obtaining the data and filing it with the FDA. He says using it afterwards is something that he has taught how to do. Well, Your Honor, the courts have answered that. If there is some subsequent use of data, whether it's preapproval or postapproval, that resolves, nevertheless, from activity that a pharmaceutical company engages in because it's reasonably related to requirements under the FDA or under any federal statute, that doesn't take us out of the safe harbor. The court has said there may be collateral or additional uses to the data. Our point is... Do you really have to stretch your analysis of the safe harbor this far in order to make the point? Perhaps not as far, Your Honor. Our point simply is that the reporting, that the practicing of this patent method, if done, is for the purpose of determining whether or not there's adverse... He's not attacking the reporting. He's attacking the subsequent use, as I understood it, which would be infringed only by the physician who says, all right, in my medical office, this is the schedule I'm going to use for administration of childhood vaccines. And I gather the only reason that these entities are the defendants is because of their instructions that accompany the vaccine. That is, it's contributing to the infringement. Purportedly, according to those allegations, that's what we understand it to be. However, I think you hit right on the head. What has to be focused on is the work that was done by the pharmaceutical company. And if his method is used, we're saying that was used to report data to the FDA. And that's why we don't accept and urge this court not to accept a pre-approval versus a post-approval line, a magic line. That shouldn't be, we maintain, the focal point of the analysis. We're well over time. Any more questions, Mr. Pappas? Questions, Mr. Pappas? Thank you. Thank you. Mr. Cedar, if that's acknowledged, Mr. Cedar has time. Why do you not rerun all the questions in the last few minutes? Okay. Thank you. Let me first address the last 271E1 issue. What defense counsel is trying to do is extend 271E1 to a safety statute. The statute has nothing to do with safety. It's good that if you find something to be adverse that you have to report it to the FDA. But 271E1 doesn't apply to that, doesn't protect that. And as we talked about, doesn't even talk about the FDA. So to take that extension, anything that had to do with safety that requires some reporting would vitiate all patents associated with that. Things come to mind like airbags are safety-related. Whether they deploy or don't deploy requires a reporting to some government agency, probably the Department of Transportation. Well, according to this theory, if there's some safety issue and you have to do some report, patents in that area no longer apply. And that's just not correct. Counsel, before you move on, counsel for defendants argued that you never argued below that the court needs to look at the e-Family Claim Limitations, and in particular the one you read to me about 42 days and all of that. That's completely incorrect. Can you just tell me where in the record I would find evidence that you made those arguments below? Was it in particular briefs? Was it in the argument? I can get everything. I can look at all of it. So you just tell me where I'll find it. I can't point to the exact appendix page. It's in the appendix. You say it's definitely in the appendix you submitted here? I don't think it's in the appendix because they didn't raise that issue earlier. Can you provide it to us? Check with counsel the other side, and if you can find the reference, just write us one sentence. I can tell you where it is. In response to Judge Miller's question, that will save us some time. Let me just tell you, it's in the briefing. Check with opposing counsel before you write to us so we don't have an argument about what you're sending us. That's great. To respond to your question, in the briefing, when the motions for summary judgment were first filed, we argued to the court, there has been no claim construction. How can you determine infringement or non-infringement without claim construction? We submitted a chart showing that there was no construction. All the claims, not just the broad claim initiative. We asked for reconsideration based upon the fact that there was a summary judgment of non-infringement without ever interpreting what the claims mean or don't mean. So we raised that issue vigorously. That's a different... I'll look at what you present, but it seems to me that could be a different issue than whether or not you separately raised that the dependent claim should be treated differently. No, we raise it as you can. Just give us a citation where you talk about dependent claims. Okay. And we'll see if that answers our question. In addressing the mental process issue, which was addressed by Counsel for Merck, Counsel for Merck wants to weed out any novelty of the mental processes, which are part of a lot of patent claims, and then just say immunization. Merck's argument is twofold. One, that this is just a mental process claim. If it's not just a mental process claim, like here, which has the switching of the timing, then you ignore the mental process and don't look at that as part of the claim as a whole, whereas all the cases, I'll be citing that in my brief, shows you look at all of the elements. You look at the mental process elements and the non-mental process elements. You look at the claim as a whole to determine whether it has statutory subject matter and whether it has novelty and unobviousness. And we submit that the parts of the claims that can be done mentally and cannot be done mentally show the invention that's there and important aspects of the claim. Merck's argument wants to read those out and say since they're mental processes, they don't need to be considered. I definitely didn't understand what you're saying, and I recognize the problems that you find with it. What about the fact that, I think she may have also argued that it's insignificant activity, that just tacking on vaccination, immunizing someone according to what is the more... Clearly, people have been vaccinated for a long time, so the immunizing part of this whole process isn't the novelty that you mentioned, but I don't want to confuse concepts. So I think that what she might have also been saying is tacking on sort of a little bit of physical step to what is clearly just a mental process isn't enough to overcome fluke and deer, and she pointed to fluke where they said fig leaf, or whatever the language was, but tacking on an insignificant post-solution or pre-solution activity isn't enough. So tell me how you would respond to that. It's not an insignificant post-solution activity because you're immunizing. It's a method of treatment, immunizing, to reduce immune-mediated disorders that is only recognized by what we're now calling the mental process steps. So it's not... The word immunizing is trivial, but why you're immunizing, how you're immunizing, what you're immunizing, it's based on what the schedule select is. It's not a trivial step. It's a very, very important step. It saves lives. It's that important a step. In fluke, recognizing whether something was too hot or too cold, whatever the mental process was, is the extrusion too hot or too cold change the time? The mental process itself was trivial, and the solution, the implementation was trivial. The mental process is far from trivial, and again, I'm calling it a process for the sake of argument here, because it is the recognition of not only something that was never recognized, but something that was taught against in the prior art, as you heard. Defendants have already talked about this case. They still don't believe that there's a correlation that Dr. Klassen has found, and that DeStefano's report actually substantiates it, even though they say they don't. There's still some argument about that. So it's important, and that's why I'm saying you can't divorce the mental steps from the non-mental steps and say, oh, look, that non-mental step is trivial. If that non-mental step is based upon the significant, as the lower court found, non-obvious and novel mental processes... But the lower court didn't find non-obvious and novel. They just denied summary judgment. Okay. Isn't that right? The lower court found it was not in the prior art. They found it was not... I didn't see that. Is there a trial memo somewhere, a bench memo? In the court's decision, they say that... They say the defendants have not raised, have not shown any evidence where any of this is found, or argued. All right. We must move on. Okay. Is there anything else? It's in the trial report.